```
                UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS

JOSIE HATUEY, an individual,  )
                              )
          Plaintiff,          )  CIVIL ACTION NO.
                              )  1:16-cv-12542-DPW
v.                            )
                              )
IC SYSTEM, INC., a Minnesota  )
Corporation,                  )
          Defendant.          )
```

MEMORANDUM AND ORDER
November 14, 2018

The Plaintiff, Josie Hatuey, filed this action against Defendant, IC Systems, Inc. ("ICS"), for violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq*., and the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. Both counts arise from the same set of facts: a series of phone calls that Mr. Hatuey received from ICS in 2015 and 2016. ICS has moved for summary judgment as to both counts.

## I. BACKGROUND

Mr. Hatuey lives in Roxbury, Massachusetts. In 2015, he started a new job and obtained a new cellular telephone to use for work purposes. Mr. Hatuey contends that in September of that year, he started receiving phone calls from ICS, a Minnesota-based company specializing in debt-collection, asking for a Mr. Brian O'Neill.[1] Mr. Hatuey informed ICS that he was

---

[1] The ICS account notes provided in discovery for Mr. O'Neill's

not Mr. O'Neill and asked ICS to stop contacting him.

Although Mr. Hatuey did not recall the specific dates or times, he asserts he received phone calls from ICS several times a week from different numbers, including from the telephone number, "(603) 414-1924." On occasion, there were multiple calls per day. While ICS does not dispute that it made such calls, it does dispute the number of calls and their frequency and the documentary evidence indicates the first call was in February 2015, not September 2015 as Mr. Hatuey has testified.[2]

Mr. Hatuey was not charged for the relevant telephone calls. The calls did not arrive at inappropriate hours, and the representatives who called were not impolite or otherwise abusive. However, on at least a few instances, Mr. Hatuey heard

---

account show that Mr. Hatuey was contacted in February 2015. ICS has not focused on this particular discrepancy in Mr. Hatuey's testimony and while questions regarding capacity to recall might be raised, nothing turns on the precise date the phone calls began. Mr. Hatuey does not deny that he received calls from ICS in February 2015; rather, in response to the ICS statement of undisputed facts, he stated that he "lacks personal knowledge of the exact date ICS first spoke to him." As will appear below, Mr. Hatuey's inability to provide specificity in the face of the documentary evidence does bear on his ability successfully to resist the ICS summary judgment motion.
[2] While the summary judgment motion was being briefed, a discovery dispute was pending. Before summary judgment briefing was completed, Magistrate Judge Boal resolved the discovery dispute and no effort to obtain reconsideration was sought. The parties also did not move to amend or supplement their briefing with respect to the summary judgment motion in light of the discovery order. Consequently, I treat the record before me as complete and will act upon it in its current form for purposes of determining the summary judgment motion.

an artificial computer-generated voice on the other end of the line when he answered a call. The calls stopped in December 2016.

## II. STANDARD OF REVIEW

This court will grant summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Materiality is determined by the substantive law, which identifies "which facts are critical and which facts are irrelevant." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To be material, a fact must "carr[y] with it the potential to affect the outcome of the suit under applicable law." *Sanchez* v. *Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996); *see also Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1968)("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

Consequently, summary judgment is appropriate if, drawing all inferences from the underlying facts in the light most favorable to the non-movant, "the record taken as a whole could not lead a rational trier of fact to find for the non-moving

3

party." *Matsushita Elec. Indus. Co.* v. *Zenith Radio*, 475 U.S. 574, 587 (1986); *see also Rogers* v. *Fair*, 902 F.2d 140, 143 (1st Cir. 1990) ("There must be sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . . In such a review, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.") (internal quotations and citations omitted).

This does not mean, however, that *any* dispute found in the record will be sufficient to defeat summary judgment. The nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. He must "exceed[ ] the 'mere scintilla' threshold" and offer specific facts, substantiated by the record, that would allow a reasonably jury to find in his favor. *Big Apple BMW, Inc.* v. *BMW of North America, Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). "[T]estimony and affidavits that 'merely reiterate allegations made in the complaint, without providing specific factual information made on the basis of personal knowledge' are insufficient" to defeat summary judgment. *Velazquez-Garcia* v. *Horizon Lines of Puerto Rico*, 473 F.3d 11, 18 (1st Cir. 2007); *see also Guillaume* v. *Wells Fargo Home Mortgage Corp.*, 2014 WL 2434650, *3 (D. Mass. 2014); *Transamerica Occidental Life Insurance Co.* v. *Total Systems, Inc.*, 513 F. App'x 246, 250 (3d Cir. 2013).

**III. ANALYSIS**

*A.  The FDCPA Claim.*

The FDCPA was passed "to eliminate abusive debt collection practices by debt collectors [and] to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged."  15 U.S.C. § 1692.  The legislation prohibits any activity "the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt," including, but not limited to activity that "caus[es] a telephone to ring or engag[es] any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number."  15 U.S.C. § 1692d.

Mr. Hatuey's claim under the FDCPA rests on his allegation that ICS made dozens of phone calls to his cellphone between September 2015 and December 2016, seeking to collect a debt owed by a Mr. O'Neill.  ICS disputes not only the number and frequency of these calls but also that it placed these calls with the intent to "annoy, abuse, or harass."

Thus, to succeed on its motion for summary judgment, ICS must show that no reasonable jury could find either that it contacted Mr. Hatuey "with the "intent to annoy, abuse, or harass," 15 U.S.C. § 1692d(5), or that the natural consequence of those phone calls was to "harass, oppress, or abuse" Mr.

5

Hatuey. 15 U.S.C. § 1692d. "Ordinarily, whether conduct harasses, oppresses, or abuses will be a question of fact for the jury." *Jeter* v. *Credit Bureau, Inc.*, 760 F.2d 1168, 1179 (11th Cir. 1985).

In determining whether conduct has the natural consequence of "harassing, oppressing, or abusing" the consumer, conduct "is to be viewed from the perspective of the hypothetical unsophisticated consumer." *Pollard* v. *Law Office of Mindy L. Spaulding*, 766 F.3d 98, 103 (1st Cir. 2014).[3] Though this standard is more permissive than the ordinary reasonable person standard, it is not so elastic as to include any kind of

---

[3] The circuits seem to be split, at least as a matter of linguistic formulation, on the most appropriate standard to use when evaluating claims under the FDCPA. The First Circuit has adopted the same formulation as the Seventh and the Eighth Circuits and considers claims from the perspective of the "hypothetical unsophisticated consumer." *See, e.g.*, *Peters* v. *General Service Bureau, Inc.*, 277 F.3d 1051, 1055 (8th Cir. 2002); *Gammon* v. *GC Services Ltd. Partnership*, 27 F.3d 1254, 1257 (7th Cir. 1994). Other courts, including the Second, Third, and Eleventh Circuits, have adopted a "least sophisticated consumer" standard. *See, e.g.*, *Jensen* v. *Pressler & Pressler*, 791 F.3d 413, 419-20 (3d Cir. 2015); *Clomon* v. *Jackson*, 988 F.2d 1314, 1319-20 (2d Cir. 1993); *Jeter* v. *Credit Bureau, Inc.*, 760 F.2d 1168, 1179 (11th Cir. 1985). As the First Circuit has noted, "there appears to be little difference" between the two formulations, and the existing squabble over the appropriate standard "is a distinction without much of a practical difference." *Pollard* v. *Law Office of Mandy L. Spaulding*, 766 F.3d 98, 103 n. 4 (1st Cir. 2014)(citing *Avila* v. *Rubin*, 84 F.3d 222, 227 (7th Cir. 1996)). The First Circuit expressly "adopt[ed] the unsophisticated consumer formulation to avoid any appearance of wedding the standard to the 'very last rung on the sophistication ladder.'" *Id*.

conduct; it "preserves an element of reasonableness" that does not allow a debt collector to be held liable for any consumer's "chimerical or farfetched" response to an attempt to collect. *Id*. at 104. It does not, for example, shield "even the least sophisticated recipients of debt collection activities from the inconvenience and embarrassment that are natural consequences of debt collection." *Pollard* v. *Law Office of Mindy L. Spaulding*, 967 F. Supp. 2d 470, 475 (D. Mass. 2013).

Consequently, phone calls intended to contact a debtor, even if made persistently and over an extended period of time, cannot alone lead to liability under the FDCPA. Rather, I look to the "volume, frequency, and persistence of calls, to whether defendant continued to call after plaintiff requested it cease, and to whether plaintiff actually owed the alleged debt." *Davis* v. *Diversified Consultants, Inc.*, 36 F. Supp. 3d 217, 228 (D. Mass. 2014).

I address of these factors in turn.

1. <u>Volume, frequency, and persistence of phone calls.</u>

As a general matter, "[w]hether there is actionable harassment, or annoyance turns not only on the volume of calls made, but also on the pattern of calls." *Akalwadi* v. *Risk Management Alternatives, Inc.*, 336 F. Supp. 2d 492, 505 (D. Md. 2004). A pattern of phone calls that suggests the debt collector was trying, albeit persistently, to contact the

7

consumer does not give rise to liability under the FDCPA, even if there were dozens – or hundreds - of calls over a relatively short period of time. *Clingaman* v. *Certegy Payment Recovery Services*, 2011 WL 2078629, *4 (S.D. Tex. 2011).

For example, a debt collector who placed somewhere between 20 and 60 phone calls to an individual in the course of five weeks was held not liable under the FDCPA because the consumer did not answer the calls or otherwise tell the debt collector to stop contacting her. *See generally*, *Saltzman* v. *IC Systems, Inc.*, 2009 WL 3190359 (E.D. Mich. 2009). Similarly, a debt collector who placed 149 telephone calls to a consumer in the course of two months was held not liable because the pattern and frequency of the calls "suggests an intent by [the collector] to establish contact with [the consumer], rather than an intent to harass." *Carman* v. *CBE Group, Inc.*, 782 F. Supp. 2d 1223, 1232 (D. Kan. 2011).

The documentary evidence of record before me does not indicate anything near that pattern or volume of phone calls. Instead, it indicates that Mr. Hatuey was contacted once by ICS on February 5, 2015, and six times between November 23 and December 1, 2016. Mr. Hatuey answered only one of the phone calls made in 2016, and informed ICS during that call that it had reached the wrong number. Even drawing all reasonable inferences in favor of Mr. Hatuey, this volume and pattern of

phone calls does not raise the inference of an intent to harass. It only suggested that ICS sought to get in touch with the correct debtor.

To be sure, a suggestion in the record to the contrary comes from Mr. Hatuey's deposition, where he testified that ICS contacted him multiple times a week, using different phone numbers, over the period of several months. However, in the course of that testimony, Mr. Hatuey could not recall specific dates or times that he received phone calls. Moreover, Mr. Hatuey has presented no other evidence of multiple phone calls to supplement his deposition testimony, although he had ample opportunity to do so. The phone records he filed as part of his submissions in opposition to summary judgment are only a page long; they certainly do not substantiate his contention that ICS called him repeatedly. Although Mr. Hatuey ultimately gained access to unredacted account notes – or at least did not raise any further objection to the discovery he received – he has not submitted any of those notes in opposing summary judgment. Nor has Mr. Hatuey sought to supplement his original filing opposing summary judgment with any additional documents. *See supra* note 2.

Faced with these circumstances, I must conclude that the record before me is complete. Even drawing all reasonable inferences in favor of Mr. Hatuey, no reasonable jury could

find, based on the volume, frequency, and pattern of phone calls, that ICS contacted him with the intent to "harass, oppress, or abuse."

2. <u>Whether ICS continued to call after being asked to stop</u>

The second factor I consider is whether ICS continued to call Mr. Hatuey after being asked to stop. As Mr. Hatuey testified, and as the record indicates, ICS called him about two debts owed by a Mr. O'Neill and an O'Neill, LLC, respectively. Mr. Hatuey told ICS that he did not know of a Mr. O'Neill or an O'Neill, LLC, that he did not owe this debt, and that ICS should stop calling him.

The record shows that, on February 5, 2015, ICS called Mr. Hatuey for the first time in relation to account number 9119 and, after being told that his number was invalid, did not call him again in relation to that account. ICS again called Mr. Hatuey between November 23 and December 1, 2016 in relation to account number 0119 and, after again being told the number was invalid, ceased contacting him regarding that account as well.[4]

---

[4] The ICS Account Notes indicate that Mr. Hatuey's phone number was listed as the contact for two accounts, representing two different debts. The first account, ending in 0119, was related to a debt of $971.05 (a principal amount $885.82 with a collection charge of $85.23) owed by O'Neill, LLC to T-Mobile USA, Inc. The second ends in 9199 and represents a debt of $2,486.64 owed by Mr. Brian O'Neill to AT&T Mobility. Mr. Hatuey does not contest that the two accounts represent two different debts.

10

Although both the calls in December 2016 and in February 2015 were made to the same phone number, they were associated with different accounts, and therefore with different debts owed by different entities to different companies. Consequently, even though ICS did contact Mr. Hatuey after being asked to stop, it did not do so in conjunction with the same account or with the same debt. The fact that ICS did not identify the two accounts as both listing the same incorrect phone number is not sufficient to show an intent to "harass, oppress, or abuse." At most, this evidences that ICS was careless in cross-referencing the phone numbers in its database, but it does not evidence that ICS acted with ill will. *See Kenny* v. *Mercantile Adjustment Bureau, LLC*, 2013 WL 1855782, *3 (W.D.N.Y. 2013)(holding that "[n]o inference of intent to annoy, abuse, or harass can reasonably be drawn" when a debt collector contacts the same consumer multiple times, but with respect to different accounts related to different debts).

In the absence of record evidence indicating that ICS continued to call Mr. Hatuey with respect to a separate debt after being asked to stop with respect to that specific debt, a reasonable jury could not find that ICS acted with the intent to "harass, oppress, or abuse" by calling Mr. Hatuey in 2016 after being asked to stop the previous year with respect to another debt.

### 3. Phone calls based on an invalid or non-existent debt

The final factor I must consider is whether the phone calls were made in conjunction with a valid debt. The Ninth Circuit, for instance, has held that "a trier of fact would certainly be reasonable in finding that, if [the debt collector] *knew* the debt she was collecting was invalid, the natural consequence of repeatedly calling [the consumer] to demand payment of that debt was to 'harass, oppress, or abuse.'" *Clark* v. *Capital Credit & Collection Serv.*, 460 F.3d 1162, 1178 (9th Cir. 2006). A reasonable jury could also find that a debt collector who knows that the amount of the debt is overstated but persists in calling the consumer to collect the full amount violated the FDCPA. *Id.*

A debt collector who is notified that it has been calling the wrong person about an otherwise valid debt, but nonetheless fails to stop calling may also violate the FDCPA. At the very least, a consumer who can show that a debt collector did something similar may have raised a triable issue of fact and may present his claim to a jury. *See, e.g.*, *Kerwin* v. *Remittance Assistance Corp.*, 559 F. Supp. 2d 1117, 1124 (D. Nev. 2008); *Meadows* v. *Franklin Collection Services, Inc.*, 414 F. App'x 230, 235-36 (11th Cir. 2011) (per curiam); *Litt* v. *Portfolio Recovery Associates, LLC*, 146 F. Supp. 3d 857, 875 (E.D. Mich. 2015).

Here, Mr. Hatuey contends that he, too, was contacted multiple times after informing ICS that he was not Mr. O'Neill, that ICS had reached the wrong person, and had asked ICS to please stop calling. Had Mr. Hatuey provided specific evidence, either through documents or testimony, that, after he informed ICS that they had reached the wrong number, ICS continued to call, he would likely have raised a triable issue of material fact. *See Velazquez-Garcia*, 473 F.3d at 18 (holding that, while testimony that "merely reiterate[s] allegations made in the complaint" is insufficient, deposition testimony that "sets forth specific facts" that "if proven, would affect the outcome of trial" can defeat summary judgment). However, the record before me is devoid of any such evidence. Indeed, the documentary record, as it is now before me, does not indicate that Mr. Hatuey was contacted multiple times with respect to a given account number *after* he informed ICS that it had reached the wrong person. Mr. Hatuey's testimony provides only broad, conclusory statements about the number of phone calls he received, without any specifics that could contradict the documents before me.

Consequently, I find Mr. Hatuey has not raised a triable issue of material fact that is analogous to those raised in *Clark*, 460 F.3d at 1178, and *Kerwin*, 559 F. Supp. 2d at 1124. A reasonable jury could not conclude that ICS persisted in calling

Mr. Hatuey after being notified that the number it called did not belong to Mr. O'Neill.

### 4. Conclusion

In the absence of any reliable and specific evidence to the contrary, I find that Mr. Hatuey has not raised a triable issue of material fact with respect to his claims under the FDCPA. ICS is entitled to a judgment as a matter of law.

### B. *The TCPA Claim.*

Mr. Hatuey also alleges that the phone calls made by ICS violated the Telephone Consumer Protection Act, 47 U.S.C. § 227. The TCPA prohibits any person from making any call, other than for emergency purposes or with the prior express consent of the recipient, "using any automatic telephone dialing system or an artificial or prerecorded voice" to "any telephone number assigned to a . . . cellular telephone service . . . for which the called party is charged for the call." 47 U.S.C. § 227(b)(1)(iii). An automatic telephone dialing system ("ATDS") is any equipment which has the capacity "to store or produce telephone numbers to be called, using a random or sequential number generator" and "to dial such numbers." 47 U.S.C. § 227(a)(1).

Mr. Hatuey rests his TCPA claim on his assertion that, on at least a few occasions, the calls he received from ICS were placed using an ATDS and had an artificial or pre-recorded voice

14

on the other end.  ICS does not contest that it placed the calls that Mr. Hatuey received or that it uses an automated system, known as the LiveVox Human Call Initiator ("LiveVox HCI") to call Mr. Hatuey.  ICS rests its defense on the contention that LiveVox HCI is not an ATDS within the scope of the TCPA.  [*Id.*]

   1.   What Counts as an ATDS.

Over the years, as telecommunications technology becomes more sophisticated, the Federal Communications Commission ("FCC") has expanded the definition of an ATDS.  *See In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 F.C.C.R. 14014, 14017 (2003).  Specifically, the FCC has taken the position that "a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress."[5]  *Id.* at 14093.  Although the question of what weight should be given to an FCC rule interpreting the TCPA

---

[5] FCC Rules currently define a "predictive dialer" as "equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls.  The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers."  *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 F.C.C.R. 14014, 14091 (2003).  Most of the time, an individual has to program the numbers to be called into the equipment and the software then "calls them at a rate to ensure that when a consumer answers the phone, a sales person is available to take the call."  *Id.*

15

is subject to ongoing dispute,[6] federal courts have generally accepted the FCC's determination that predictive dialers fall within the scope of the TCPA's prohibition on calls placed by an ATDS if the software can, in fact, generate random or sequential numbers. *See, e.g.*, *Davis*, 36 F. Supp. 3d at 226; *ACA Intern. v. F.C.C.*, 885 F.3d 687, 702 (D.C. Cir. 2018); *Dominguez v. Yahoo, Inc.*, 629 F. App'x 369, 371 (3d Cir. 2015).[7]

---

[6] The Supreme Court yesterday granted *certiorari* on a question regarding the reach of the Hobbs Act that may define the scope of such deference. *PDR Network, LLC* v. *Carlton & Harris Chiropractic, Inc.*, 883 F.3d 459 (4th Cir. 2018), *cert. granted in part*, --S.Ct.--, 2018 WL 3127423 (Nov. 13, 2018)(No. 17-1705).

[7] Mr. Hatuey urges me to adopt the definition of an ATDS promulgated in the FCC's 2015 rules struck down by the D.C. Circuit. *ACA Intern. v. F.C.C.*, 885 F.3d 687, 699 (D.C. Cir. 2018). Those rules took the position that the term "capacity" in the TCPA did "not exempt equipment that lacks the 'present ability' to dial randomly or sequentially." *In the matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 F.C.C.R. 7961, 7974 (2015) (hereinafter "2015 Rule"). This would mean that anything that *could possibly* be made to dial randomly or sequentially, even if it did not do so at the time in question, falls within the scope of the TCPA. *Id.* That approach strikes me as an overbroad reading of the plain text of the TCPA.

Indeed, the D.C. Circuit held that the FCC's 2015 interpretation of the TCPA is "utterly unreasonable in the breadth of its regulatory [in]clusion," and therefore is both an impermissible construction of the statute and "would not satisfy APA arbitrary-and-capricious review." *ACA Intern.*, 885 F.3d at 699 (internal quotations and citation omitted). In so holding, the court observed that "[i]f a device's 'capacity' includes functions that could be added through app downloads and software additions, and if smartphone apps can introduce ATDS functionality into the device, it follows that all smartphones, under the Commission's approach, meet the statutory definition of an autodialer." *Id.* at 697. The court observed further that "it is untenable to construe the term 'capacity' in the

A particular piece of software has been held to fall within the TCPA's scope if it has the present capacity to generate phone numbers and place calls to these numbers automatically. These phone numbers need not be produced by a random number generator; a dialer that is connected to a database that contains information about individuals may nevertheless constitute an ATDS if it can dial numbers stored in the database automatically. *See In re Collectco, Inc.*, 2016 WL 552459, *1-2, n. 1 (D. Mass. 2016); *see also Luna* v. *Shac, LLC*, 122 F. Supp. 3d 936, 940 (N.D. Cal. 2015) ("the fact that [the defendant's] system has the ability to send text messages from preprogrammed lists, rather than randomly or sequentially, does not disqualify it as an ATDS."). The capacity to store phone numbers and to dial them need not be consolidated in the same piece of equipment; "various pieces of different equipment and software

---

statutory definition of an ATDS in a manner that brings within the definitions' fold the most ubiquitous type of phone equipment known." *Id*. at 698. As a result, the D.C. Circuit struck down this portion of the 2015 Rule as invalid.

The Ninth Circuit has suggested that the D.C. Circuit's holding in *ACA Intern.* is consistent with the Hobbs Act, while acknowledging that the scope of the Hobbs Act remains an open question. *Marks* v. *Crunch San Diego*, 904 F.3d 1041, 1049 (9th Cir. 2018). The Supreme Court's ultimate decision in *PDR Network, cert. granted* --S.Ct.--, 2018 WL 3127423 (Nov. 13, 2018)(No. 17-1705), *see supra* note 6, may affect the continued vitality of the D.C. Circuit's approach in striking down the 2015 Rule. However, for now, in the absence of further direction from developing case law, I decline to adopt the broad reading of the definition of an ATDS promulgated by the FCC's 2015 Rule.

can be combined to form an autodialer," so long as the system as a whole may store or produce telephone numbers to be called. *Estrella* v. *Ltd Financial Services, LP*, 2015 WL 6742062, *2 (M.D. Fla. 2015).

What distinguishes an ATDS, according to both the FCC and several federal courts, is the capacity of the system "to dial telephone numbers from a list without human intervention." *Gragg* v. *Orange Cab Co., Inc.*, 995 F. Supp. 2d 1189, 1192 (W.D. Wash. 2014); *see also* Johnson v. *Yahoo!, Inc.*, 2014 WL 7005102, *3 (N.D. Il. 2014); *Luna*, 122 F. Supp. 3d at 940; *Davis*, 36 F. Supp. 3d at 225. "Dialing systems which require an agent to manually initiate calls do not qualify as autodialers under the TCPA." *Pozo* v. *Stellar Recovery Collection Agency, Inc.*, 2016 WL 7851415, *3 (M.D. Fla. 2016).

2. The ICS software is not an ATDS.

Even if I were to accept a broad reading of the FCC's definition of an ATDS as a system which may draw phone numbers from a database, rather than only through a random or sequential number generator, there would be no genuine issue of material fact on Mr. Hatuey's TCP claim. Both Mr. Hatuey and ICS agree that the relevant calls were placed using a system known as LiveVox HCI, and that this system requires a human "clicker agent" who must manually click a button to place a call. This alone disqualifies the LiveVox HCI system as an ATDS under the

18

TCPA. *See, e.g.*, *Pozo*, 2016 WL 7851415 at *3-4 (holding that the identical software – the LiveVox HCI, is not an ATDS because it uses a "clicker agent"); *Schlusselberg* v. *Receivables Performance Management, LLC*, 2017 WL 2812884, *3 (D. N.J. 2017)(same); *Jenkins* v. *mGage, LLC*, 2016 WL 4263937, *5 (N.D. Ga. 2016) (holding that a similar software which requires an individual to click to initiate a call is not an ATDS).

Mr. Hatuey has not adduced any evidence that ICS used any other kind of software to place its calls to him. He has also not produced any LiveVox HCI software manuals or similar instructions guides that could show that the system, in fact and in derogation of previous findings in the case law, does place calls automatically.

Given the state of the summary judgment record, no reasonable jury could conclude that ICS used a system that does not require human intervention to place the telephone calls at issue. Because the record demonstrates as a matter of law that it did not, the phone calls Mr. Hatuey seeks to put at issue here fall outside the scope of the TCPA's prohibition. Consequently, ICS is entitled to a judgment as a matter of law.

Accordingly, I will grant summary judgment in favor of ICS on the TCPA claim.

## IV. CONCLUSION

For the reasons set forth above, I ALLOW the motion of ICS for summary judgment on both the FDCPA claim and the TCPA claim. The Clerk shall enter judgment for the defendant.

*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE